UNITED STATES DISTRICT COURT                                      C/M
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                                         :
KHALIK JONES,                                            :
                                    Plaintiff,           :      **MEMORANDUM DECISION**
                                                         :      **AND  ORDER**
                      - against –                        :
                                                         :      18-cv-0665 (BMC) (AYS)
SHERIFF OF SUFFOLK COUNTY, *et al.*,                     :
                                                         :
                                    Defendants.          :
                                                         :
-------------------------------------------------------- X

**COGAN,** District Judge.

        This is a *pro se* prisoner's civil rights action under 42 U.S.C. § 1983.  Plaintiff filed a

number of pleadings after the initial complaint that the previously assigned Magistrate Judge

deemed "supplemental".  That resulted in surviving claims against 24 defendants employed by

Suffolk County prison facilities or law enforcement, not counting the claims against another

dozen or so institutional and state-employed defendants who were previously dismissed.  All of

these claims arise largely from unrelated incidents while plaintiff was in custody, although a few

of the claims involve two defendants.  In opposition to defendants' motion for summary

judgment, however, plaintiff has not pursued his claims against 19 of the defendants.  As to those

19 defendants, I have reviewed the record in light of plaintiff's *pro se* status and conclude that

those defendants are entitled to summary judgment.[1]

---

[1] These are: Sheriff Errol Toulon, Former Sheriff Vincent DeMarco, Warden Michael Franchi, Dr. Stephen John, LPN Sha'Kiera Bryant, Corrections Officer Jeffrey Campbell, Corrections Officer Sergeant Brian Loppicollo, Corrections Officer Michael Newman, Corrections Officer Franklin Scholl, Corrections Officer Sergeant John Lowry, Corrections Officer Michael Mazzaferro, Corrections Officer Thomas Heavey, RN Maryann Jadick, CNP Amy Malave, Sergeant Vincent Worthington, LPN Dot Kerrigan, Corrections Officer Michael Ryan, Corrections Officer Raymond Falk, and Corrections Officer Zachary Tyler.

That leaves us with five defendants.  I will discuss plaintiff's claims as to each of them below.  I have taken the facts from plaintiff's affidavits and exhibits, except as to additional facts that defendants have proffered which he does not dispute, and have construed the record in the light most favorable to plaintiff.[2]

## I.    Dr. Geraci and Dr. Wickramaaratchi ("Dr. Ari")

### A.    Background

Plaintiff's claims against these two staff physicians arise out of separate incidents.  I have attempted to reconstruct the record of his complaints and the facilities' responses from the medical records and his requests for medical appointments (which were extensive).  For the most part, the incidents arise out of plaintiff's relentless demands for oxycodone and the doctors' decisions to first give him other painkillers instead, and then, when he engaged in hoarding the substitutes, cut him off.

As to the first incident, plaintiff arrived at the Suffolk County Correctional Facility ("SCCF") as a pretrial detainee on May 27, 2017.  He had his initial medical screening from Dr. Ari.  Plaintiff advised Dr. Ari that he suffered from nerve damage and "other debilitating injuries," that he had "extreme chronic pain," and that he needed the prescribed medications that he brought with him.  Those medications were Oxycontin (generic: oxycodone, a very strong opiate); Robaxin (generic: methocarbamol, a muscle relaxer that blocks nerve/pain sensations); and Neurontin (generic: gabapentin, an anti-seizure medication).  Dr. Ari confirmed through a medical database that plaintiff had a prescription for these medications.

---

[2] Since I am dismissing all of plaintiff's claims against these defendants on the merits, I need not reach defendants' qualified immunity arguments. See Cty. of Sacramento v. Lewis, 523 U.S. 833, 842 n. 5 (1998).

Dr. Ari advised plaintiff that he was going to change the oxycodone prescription to codeine sulfate. Plaintiff objected to this change.

By May 29, 2017, plaintiff had not received one of his medications, apparently the codeine sulfate. That same day, plaintiff submitted a medical health request form, noting that he was requesting "mental health" treatment. He checked boxes showing he had a "medication problem"; a "mental health issue"; and "pain" in his hand, wrist, and back. In the narrative portion of the form, he wrote, "I really need to speak with someone & I had a psych earlier this month when I was home." The request went to Dr. Geraci, who noted that the missing drug was not currently available in the SCCF pharmacy and referred plaintiff's case back to Dr. Ari to prescribe a replacement medication. Dr. Geraci made a note in plaintiff's chart that there was "[n]o indication that this case needs immediate attention."[3] On June 2, 2018, some six days after his admission to SCCF, plaintiff began receiving codeine sulfate. Ultimately, a grievance panel concluded that plaintiff should have been given a "bridge" medication for the six days between May 27th and June 2nd.

The second incident traces back to July 3, 2017, when plaintiff requested another medical consultation, this one labeled "medical" (not "mental health"). Essentially, he demanded that SCCF reinstate his oxycodone prescription because he did not consider the codeine sulfate to be adequate. He complained that the "pain medication [codeine sulfate] was not working and I've been expressing this since day one that I NEED my medication [oxycodone], and it's like you don't even care." He filed similar requests with increasing levels of agitation on July 6th, 7th, 8th, and 12th, the last of which noted that he had "excruciating chronic pain, due to having nerve

---

[3] Defendants maintain that plaintiff actually met with Dr. Geraci on June 29th, but plaintiff denies such a meeting. It is not material whether they met on that day or not, and, in any event, I accept plaintiff's version for purposes of this motion.

3

damage." He saw Dr. Geraci on July 20th, who suggested a cane as a possible way to reduce his leg pain. On July 21st, 22nd, and 24th, plaintiff filed additional requests for medical intervention, focusing on his need for the cane.

After meeting with plaintiff, Dr. Geraci concluded that plaintiff was malingering. He noted on July 13, 2017 that plaintiff

> DOES NOT need any additional meds in my opinion and if I were him, then I would request that we reduce any of the meds he is taking. I do not believe that his pain is 8 of 10 as reported and I think he just wants more medication (not considering the negative effects of the meds on his organ systems). He does not want a reduction of meds at this time despite my recommendation that he only takes what he needs in terms of his aches and pains that he reports. Again, he is not in any distress and looks well.

A week later, Dr. Geraci commented further on plaintiff's condition:

> We reviewed his EKG and it is noted to have bradycardia with [] RBBB and LAFB; my concern is that the meds may be causing a conduction delay as he is taking Codeine, Robaxin, Neurontin, Seroquel and he seems to want more narcotic analgesics but he is refraining for now due to the benefit risk concerns that I have regarding cardiac status. He agrees that NOT adding additional meds is the prudent thing to do at this time and he accepted my offer for a PT eval and to see if a cane has more benefit than harm for his needs; [although] a cane can cause problems associated with center of gravity compensations which can result in more back pain.[4]

Plaintiff nevertheless received a change of pain medication a few days or a week later,[5] but not back to the oxycodone that he wanted. Instead, his codeine sulfate prescription was changed to morphine sulfate.

About seven weeks later, on September 13, 2017, plaintiff was caught during a cell check and internal strip search hoarding his morphine and Seroquel, *i.e.*, not taking them. The cell

---

[4] Bradycardia is a slow heart rate, which could be caused by the conditions to which Dr. Geraci referred, *i.e.*, RBBB (right bundle branch block) and LAFB (left anterior fascicular block).

[5] Dr. Geraci's interrogatory responses assert that plaintiff's medication was changed on July 26, 2017, but the medical records suggest that the start date for the new medication was August 6, 2017.

check occurred because he was observed on a video recording talking to a female inmate[6] who was then found in possession of morphine sulfate (for which she apparently had no prescription). The search of plaintiff and his cell resulted in the discovery of 23 Seroquel pills and 27 morphine pills.  The vast majority of the pills were found in plaintiff's buttocks wrapped in plastic.

On the same day that the pills were found, Dr. Geraci terminated plaintiff's prescription for the morphine and Seroquel, concluding that if plaintiff was hoarding and hiding it, there was no reason to prescribe it.  The next day, the facility filed disciplinary charges against plaintiff for possessing and hiding the contraband morphine and Seroquel.  He was found guilty and penalized with an extensive loss of privileges.  He was also criminally charged with illegal drug possession.[7]

Plaintiff does not dispute any of this but adds some embellishment.  According to plaintiff, he was hoarding some, but not all, of his medication because taking the prescribed amount made him feel sleepy and he needed to focus on his legal case because he was suffering from "ineffective assistance of counsel."  He asserts that he confronted medical on several occasions (no particulars given and nothing in the record) to discuss this problem but was told that if he wasn't going to take the prescription medication according to the schedule that the doctors wanted him to, then the medical department would no longer prescribe the medication.

Two things happened thereafter.  First, plaintiff suffered seizures on September 16th and September 18th.  He had a long history of seizures stemming from epilepsy that may have been

---

[6] Plaintiff referred to this female inmate in his deposition as a "playmate."

[7] As of the date of plaintiff's deposition in this action, that criminal charge remained pending.  Its current status is not disclosed in the record before me.  However, the public record reflects that plaintiff's current prison sentence includes a conviction for promoting prison contraband in the first degree.  Available at: http://nysdoccslookup.doccs.ny.gov/GCA00P00/WIQ3/WINQ130 (last visited Feb. 8, 2021).  It seems likely, but not certain, that this conviction is for the incident at issue in this case.

triggered by a fall in his youth.  His prescription for Neurontin was purposed specifically as an anti-seizure medication, and he had been taking it for decades.

Second, plaintiff was receiving care from a psychiatrist at SCCF, Dr. Chatterjee, who reinstated his Seroquel prescription on October 14, 2017.  On October 20th, Dr. Geraci countermanded that prescription, stating, "this patient was caught misusing seroquel and mso4 [morphine sulfate], he is not trustworthy or reliable; that's dangerous, and I will not allow those meds at this time; safety reason."  Dr. Chatterjee saw plaintiff again on October 28th, and renewed the Seroquel again.  It does not appear to have been terminated thereafter.

From this chain of events, plaintiff contends that Drs. Ari and Geraci were deliberately indifferent to his medical needs in three respects: (1) they left him without pain medication for six days (May 27, 2017 to June 2, 2017); (2) Dr. Ari gave him codeine sulfate instead of oxycodone, even though plaintiff believes that codeine sulfate is "less affective [sic]" than oxycodone; and (3) Dr. Geraci should not have cut off plaintiff's morphine in September, or, at least, he should have "weaned" plaintiff off it slowly instead of having him go cold turkey.

## B.    Analysis

Plaintiff claims that defendants' deliberate indifference to his serious medical concerns violated his rights under the Eighth and Fourteenth Amendments.  Because he was a pretrial detainee during the period of treatment, I must evaluate his claims under the Fourteenth Amendment's due process clause.  See Yancey v. Robertson, 828 F. App'x 801, 803 (2d Cir. 2020) (citing Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017)).  That requires a showing of deliberate indifference to a detainee's medical needs.  There is both an objective and a subjective component involved in making this assessment.

Plaintiff must first demonstrate that he had a "sufficiently serious need" of medical treatment. Darnell, 849 F.3d at 29. A "sufficiently serious need" means that he was at risk for death, degeneration, or that he suffered "extreme" physical pain. See Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996). This focuses on plaintiff's physical ailments, not simply how he reported them (because detainees sometimes overstate their level of pain), but whether according to the medical records and the other facts of record, a reasonable jury could conclude that plaintiff faced death, degeneration of his conditions, or extreme physical pain. See Brock v. Wright, 315 F.3d 158, 162-64 (2d Cir. 2003) (self-reports of chronic pain considered with medical records in objective test).

The second, subjective component focuses on the intent and conduct of the physician charged with plaintiff's care. Prison officials and medical officers have wide discretion in treating prisoners, and "determinations of medical providers concerning the care and safety of patients are given a 'presumption of correctness.'" Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001) (quoting Perez v. Cty. of Westchester, 83 F. Supp. 2d 435, 440 (S.D.N.Y. 2000)). "[D]isagreements over medications, . . . forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim. These issues implicate medical judgments and, at worst, negligence . . . ." Id.

As these cases suggest, courts must be careful to not consider departure from the accepted standard of medical care, so as to constitute medical malpractice, as serious indifference. See Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998). Rather, the physician must act, at a minimum, in reckless disregard of the serious consequences that his action would cause, or, at most, with the deliberate intent to cause injury and pain. The Second Circuit has

7

phrased this standard as "act[ing] intentionally to impose the alleged condition, or recklessly fail[ing] to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." Darnell, 849 F.3d at 35.[8]

Each of plaintiff's claims fail to meet either or both of the objective and subjective criteria. Turning first to the six-day lapse of pain medication for his hand and back, there is nothing to suggest that Dr. Geraci or Dr. Ari were subjectively reckless or intentionally caused him pain. Dr. Ari understandably (and wisely, as became apparent when plaintiff started hoarding drugs) switched him from oxycodone, with its potential for abuse in the prison context (and other contexts), to codeine sulfate, a less abused but still powerful pain medication. The fact that the prison pharmacy did not have any codeine sulfate may reflect, at worst, a mistake on Dr. Ari's part, but certainly not recklessness. And when plaintiff complained two days later that he needed more pain medication, Dr. Geraci promptly sent him back to Dr. Ari for a replacement. Assuming the passage of four more days before he received a substitute caused plaintiff some degree of pain or discomfort, that brief delay is not constitutionally deficient where plaintiff suffered neither death nor degeneration of his condition. See Hathaway, 37 F.3d at 67 (serious medical need where plaintiff "experience[d] great pain over an extended period of

---

[8] Although the Second Circuit incorporated a "knew or should have known" standard in defining deliberate indifference as the outside limit of potential liability, that standard requires either expert opinion or facts that would allow a reasonable jury to reach a conclusion of recklessness, not just negligence. This is because a jury cannot be allowed to guess at the degree of deviation from objectively reasonable medical practice. Thus, although the "knew or should have known" standard may be sufficient to constitute medical malpractice under state law, cf. Cohen v. Cabrini Med. Ctr., 94 N.Y.2d 639, 709 N.Y.S. 2d 151 (2000) (physician liable for malpractice if he knew or should have known that a failure to warn created heightened risk), it requires a higher level of indifference in the constitutional context. Otherwise, the malpractice standard and the constitutional standard would merge, and "liability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process." Kingsley v. Hendrickson, 576 U.S. 389, 396 (2015) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 849, (1998)).

time" and degeneration); Morehouse v. Vasquez, No. 17-CV-4836, 2020 WL 1049943, at *18 (S.D.N.Y. Mar. 4, 2020) (pain that "subsided after a couple of days to two weeks at the most" was not sufficiently serious).

Plaintiff's assertion that Dr. Ari should have kept him on oxycodone instead of moving him to codeine sulfate merely reflects a disagreement as to the appropriate medication. But as noted above, it is well-established that a prison doctor's disagreement with a detainee over proper medical treatment does not constitute malice or reckless disregard. See, e.g., Hill v. Curcione, 657 F.3d 116, 123 (2d Cir. 2011); Sonds, 151 F. Supp. 2d at 312 ("[D]isagreements over medications . . . are not adequate grounds for a Section 1983 claim.").[9]

Similarly, plaintiff's claim that Dr. Geraci's characterization of his condition as not requiring "immediate attention" demonstrates his indifference depends entirely on plaintiff's self-description of his pain as "extreme" or "excruciating." But there are no medical or other records reflecting a level of pain requiring immediate attention other than plaintiff's self-reporting, and Dr. Geraci, who was in a position to make a judgment, concluded that plaintiff was exaggerating his pain. Plaintiff's characterization of his level of discomfort, standing alone, is an inadequate basis for a jury to conclude that either Dr. Geraci or Dr. Ari had a constitutional duty to respond faster than four days.

This is especially true considering that shortly thereafter, Dr. Geraci found plaintiff to be physically malingering and engaging in drug-seeking behavior. This is a not-unknown characteristic among the prison population, see Sanchez v. Wright, No. 09-cv-469, 2012 WL 528578, at *7 (W.D.N.Y. Feb. 17, 2012); Verbitsky v. Montalbano, No. 08-cv-5148, 2012 WL

---

[9] Plaintiff inquires why, if the doctors thought he was malingering and not in need of oxycodone, they moved him in July from codeine sulfate to morphine sulfate. It seems obvious that they gave his constant complaints enough credit to warrant a stronger medication, but insufficient to warrant oxycodone.

371994, at *3 (E.D.N.Y. Feb. 1, 2012), and one that warrants the doctor's discounting the

prisoner's credibility, cf. Weakland v. Astrue, No. 10-cv-519, 2012 WL 1029671, at *5

(W.D.N.Y. Mar. 26, 2012) ("Plaintiff's drug seeking behavior serves to generally discount her

testimony as it relates to the severity of her symptoms."); Anderson v. Shalala, 51 F.3d 777, 780

(8th Cir. 1995) (drug-seeking behaviors cast a "cloud of doubt" over the legitimacy of a

claimant's numerous doctor visits and discredits allegations of disabling pain).  See also Walker

v. Fischer, No. 08-cv-1078, 2011 WL 4369116, at *9 (N.D.N.Y. July 25, 2011) ("[I]n refusing to

prescribe stronger back pain medication, Defendant [Dr.] Lashway was entitled to her own

medical judgment that Plaintiff showed drug-seeking behavior.") (citing Wright v.

Genovese, 694 F. Supp. 2d 137, 160 (N.D.N.Y. 2010) ("[C]oncern about prescribing narcotic

pain medication, on which inmates with possible substance abuse issues could become

dependent, may inform a medical judgment about what drug to prescribe.")).

   The second incident, the suspension of morphine and Seroquel when plaintiff was caught

hoarding, has to be placed in context.  Dr. Geraci knew that plaintiff was abusing his

prescriptions – plaintiff does not deny it – and believed that the means for accomplishing abuse

was the continued refilling of the prescriptions.  Under those circumstances, the only reasonable

thing to do was eliminate the source of the abuse.

   In addition, plaintiff's argument that Dr. Geraci should have "weaned" him off these

drugs instead of cutting him off again reflects nothing but plaintiff's preferred treatment over that

directed Dr. Geraci.  Dr. Geraci had to not only consider what would make plaintiff happy and

comfortable in the short term.  He also had to consider the potential harm if he kept the opiates

and Seroquel flowing, not only to plaintiff, but to other inmates who might buy or receive

"favors" from plaintiff.  Nor is there anything in the record to allow a reasonable inference that

plaintiff suffered undue pain from being cut-off – in fact, there is nothing suggesting that plaintiff was addicted to these drugs at all – and, obviously, plaintiff's statements as to how much morphine he needed were not entitled to any credit from Dr. Geraci considering plaintiff's abuse. As Dr. Geraci stated, "He is not trustworthy or reliable; that's dangerous." No reasonable person could conclude that plaintiff's insistence on dictating his own pharmacological needs was anything else.

Finally, if plaintiff is trying to blame Dr. Geraci for his seizures (it is not clear if he is), there is nothing to support it. Plaintiff was not cut off from Neurontin, which he had been taking for decades to control his seizures, and the other drugs addressed different impairments, not the seizures.

## II.   Nurse Alarcon

Plaintiff appears to have both denial of medical treatment and First Amendment retaliation claims against this staff nurse. They arise from an incident during the dispensation of morning medication to prisoners on April 3, 2018. Although plaintiff denies using any obscene language during the encounter, it is undisputed that he engaged in some form of verbal altercation with Nurse Alarcon because he believed she had not properly cleaned a pill crusher before using it to prepare his medication, and that she was not wearing gloves. She terminated the encounter without giving him his medicine but came back just after 11:00 a.m., and plaintiff received his medication.

After the first aborted attempt to give him his medication, plaintiff filed a grievance against Nurse Alarcon for not cleaning the pill crusher and wearing gloves. The facility's grievance unit received it on April 5, 2018, at 8:08 AM. Less than six hours later, Nurse Alarcon marked a "late entry" on plaintiff's medical chart, noting that his medication on April 3 had been

11

delayed: "Apparently, Mr. Jones wanted me to use a (sterile) gauze pad opened from a package. This was not available on the med cart."  A few minutes later, she filed a Disciplinary Action Report ("DAR") against him for using obscene language during the incident.  Plaintiff's grievance was denied on the merits because his allegations regarding the incident could not be substantiated.  Nurse Alarcon's DAR was dismissed after a hearing on April 17, 2018; the hearing board stating only that the dismissal was based on "incorrect paperwork."[10]

In addition, plaintiff claims that on three occasions beginning about five weeks later – May 14, June 4, and July 31 – she withheld his medications.

Reading plaintiff's submissions liberally, it appears he is alleging that Nurse Alarcon: (1) improperly attempted to medicate him without a clean pill crusher and gloves, and then delayed his medication; (2) filed a false DAR in retaliation for the grievance he had filed against her; and (3) withheld his medications on three occasions in further retaliation for the grievance.

As to the pill dispensing incident, plaintiff acknowledges that after a brief delay, Nurse Alarcon administered his medication with a clean pill crusher and gloves.  The brief delay in medication is not actionable for the reasons stated above.  See e.g. Sonds, 151 F. Supp. 2d at 312.

The retaliation claims are more complex.  At the outset, I note that the Second Circuit has urged caution in evaluating retaliation claims by prisoners: "[B]ecause we recognize both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated, we examine prisoners' claims of retaliation with skepticism and particular care."  Hayes v. Dahlke, 976 F.3d 259, 272 (2d Cir. 2020) (quoting Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995), abrogated on other

---

[10] Plaintiff has interpreted the board's decision as being based on a finding that Nurse Alarcon lied about her encounter with plaintiff, but that is a conclusion without any support in the record.

grounds, Tangreti v. Bachmann, 963 F.3d 609 (2d Cir. 2020)).  That caution is particularly appropriate in this case because plaintiff has sued nearly three dozen individuals from three different institutions, many of them for petty disputes.  Although he has abandoned most of his claims in opposing defendants' summary judgment motion, I cannot help but be cognizant of the fact that plaintiff tends to see constitutional violations in any conduct that offends him.

To prove a First Amendment retaliation claim under 42 U.S.C. § 1983, a prisoner must first show that "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action."  Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (quoting Dawes v. Walker, 239 F.3d 489, 492 (2d Cir. 2001), overruled on other grounds, Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002)).  Even if a prisoner pleads sufficient facts to show that he plausibly meets these three factors, that is merely sufficient to state a claim for First Amendment retaliation.  See Phelps v. Kpanolas, 308 F.3d 180, 186-87 (2d Cir. 2002).  To survive summary judgment, the prisoner must do more.  He must adduce sufficient evidence to allow a reasonable jury to infer these criteria are met from the totality of the circumstances.  See Gayle v. Gonyea, 313 F.3d 677, 682-83 (2d Cir. 2002).

For purposes of this motion, defendants concede that plaintiff has produced enough evidence to show, if his view of the facts were accepted, that he engaged in protected speech – his filing of a grievance against Nurse Alarcon – and that the actions of which he complains – Nurse Alarcon's filing of a retaliatory DRA and retaliatory withholding of medication – would

constitute adverse actions.  Defendants assert, however, that there is no causal connection between plaintiff's filing of his grievance and these subsequent actions.

As to the alleged retaliatory filing of a DAR, this case presents the opposite of the usual inquiry into causation.  In most cases, in considering whether a reasonable jury could find a causal relationship, one of the factors courts consider is the temporal proximity of the alleged retaliation to the protected activity.  Although the Second Circuit has not "drawn a 'bright line' as to exactly when a temporal relationship supports a finding of a causal relationship," Hayes, 976 F.3d at 273, the general rule is that the closer they are connected in time, the more likely the facts will support an inference of causation.  See Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009) (temporal proximity established despite six months having elapsed where other evidence made it "plausible that the officers waited to exact their retaliation at an opportune time"); Hollander v. Am. Cyanamid Co., 895 F.2d 80, 85-86 (2d Cir. 1990) (passage of three months weighed against finding a causal connection).

Here, however, plaintiff has the opposite problem – the protected activity and alleged retaliation are too close in time to allow a reasonable inference of causation.  Under plaintiff's theory of the case, the grievance unit received his complaint against Nurse Alarcon at 8:08 in the morning, and by 2:00 that same day, she had both made false entries in his medical record and generated a DAR in retaliation.  Putting aside that it seems an awfully quick turnaround to engage in retaliation under almost any state of facts, plaintiff has adduced no evidence that Nurse Alarcon even knew that he had made a grievance against her when, five or six hours later, she filed the DAR.  See Faulk v. Fisher, 545 F. App'x 56, 59 (2d Cir. 2013) (summary judgment warranted on retaliation claim based on misbehavior report filed the day after prisoner's successful grievance where there was no evidence suggesting that the officers were even aware

14

of the grievance).  There is no reason to believe that his grievance traveled like greased lighting from the grievance panel to Nurse Alarcon and that she responded virtually immediately by filling out medical records and a DAR.

Plaintiff seems to recognize this deficiency.  The most that he can say in his affidavit is that "[o]n information and belief, when a prisoner files a grievance, the grievance staff calls the matter to the attention of those responsible for the matter that the grievance concerns."  That is probably true – one would hope that a grievance panel would hear from the accused staff member before making a decision – but it is not evidence that it could happen here as quickly as plaintiff posits, or that it happened at all before Nurse Alarcon filed her DAR.[11]  A jury finding that some unnamed person on the grievance panel alerted Nurse Alarcon of plaintiff's grievance as soon as it was received and that she retaliated with a DAR within a matter of hours would require a degree of speculation that juries are not permitted to undertake.

The lack of causation is even more apparent with regard to plaintiff's claim of retaliation by failing to medicate.  As plaintiff acknowledges, Nurse Alarcon had at least two opportunities to deprive plaintiff of medication every day over the next three months.  If she wanted to retaliate, it would make no sense for her to wait five weeks for one act of petty retaliation, then three weeks for another, then seven weeks for another, especially when such retaliation could have occurred twice every day from the day of the protected activity.  Grievances annexed to plaintiff's amended complaint confirm that plaintiff did not receive his medications on three days,[12] but another grievance alleging Nurse Alarcon's failure to provide medication – filed on

_____

[11] When plaintiff inquired of Nurse Alarcon as to why she waited until April 5th to file a DAR for an incident that had happened on April 3rd, she responded that the first opportunity she had to prepare a DAR was on April 5th.

[12] Plaintiff's own description of at least one of these incidents points less to retaliation and more to a missed connection: on May 14, 2018, plaintiff's grievance states that he went to the law library in the morning and religious services in the afternoon and, upon his return both times, learned that the Nurse had already come and gone.

April 6, 2018, the day after the Nurse submitted the allegedly retaliatory DAR and the most likely date for any retaliatory withholding of medication – was denied on the merits because plaintiff in fact had received his medication that day.  On these facts, no reasonable jury could view three widely dispersed, missed doses of twice-daily medications over a three-month period as causally related to his protected activity.

## III.   Captain Boyle

Plaintiff alleges that defendant Deputy Sheriff Patrick Hess sexually assaulted him in the SCCF on July 17, 2018, when plaintiff was turned over to Deputy Sheriff Hess's custody for transport to court.[13]  Plaintiff filed a grievance against Deputy Sheriff Hess for the alleged sexual assault, and Captain Boyle was assigned to investigate it.  Captain Boyle's preliminary report states that he reviewed video and concluded that plaintiff's claim against Deputy Sheriff Hess was unfounded.  Plaintiff's claim against Captain Boyle is that Captain Boyle denied him due process because he lied about reviewing any relevant video.

In discovery, plaintiff posed the following interrogatories to Captain Boyle and received the following answers:

2. In reference to grievance #R-2018-290, that Khalik Jones wrote, allegedly what camera did you review?

RESPONSE: I viewed video footage from a camera in the holding pen.

3. Allegedly, where would this camera be located at?

RESPONSE: This camera is located in the holding pen.

4. How many more cameras are located in this area, allegedly?

RESPONSE: There are two camera located in the holding pen.

---

[13] That claim is not the subject of the present motion and defendants have acknowledged that there are factual issues requiring a trial against Deputy Sheriff Hess.

16

5. Isn't it true, that there are no cameras where the Sheriff Deputies house
prisoners, awaiting to be turned over to Court Officers?

RESPONSE: I am not aware if there any video cameras where the deputy sheriffs
are assigned, for when prisoners are to be turned over to the court officers.

Plaintiff seizes upon this last response in opposing summary judgment.  He claims that he

was not assaulted in the holding pen, but "where the deputy sheriffs are assigned."  Captain

Boyle, therefore, was looking at irrelevant video, and his conclusion that no assault occurred was

without any basis.

Plaintiff is thus asserting that there is some difference between "the holding pen" and

"where deputy sheriffs are assigned" to deliver prisoners to court officers, and that he was

assaulted in the latter, not the former.  However, the grievance he filed was very vague as to

where the assault occurred, and the only place referenced was the "holding cell."  Indeed, even

the way he describes the location in opposition to summary judgment is vague.  Plaintiff

describes these "two" areas as one – he claims the sexual assault occurred "*in the holding pen*

where Deputy Sheriffs[] are assigned for when prisoners are to be turned over to the Court

Officers." (Emphasis added).  Captain Boyle reviewed the video cameras from the holding pen –

I don't see how he could do otherwise – and concluded that there was nothing in them to show

an assault.

Plaintiff may have demonstrated, at most, that Captain Boyle could have done a more

thorough job in investigating his grievance.  However, plaintiff's disagreement over how

thorough Captain Boyle should have been does not amount to a due process violation.  District

courts in this Circuit have consistently rejected due process claims based on allegations that

investigating officers did less than they should have or fabricated what they did:

The law is clear that inmates do not enjoy a constitutional right to an investigation
of any kind by government officials.  The Due Process Clause confers no right to

17

governmental aid, even where that aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual.

Banks v. Annucci, 48 F. Supp. 3d 394, 414 (N.D.N.Y. 2014) (citations omitted) (citing Bernstein

v. New York, 591 F. Supp. 2d 448, 460 & n.105 (S.D.N.Y. 2008) (collecting cases)); accord,

Jackson v. Bertone, No. 20-cv-1092, 2020 WL 6385066, at *12 (N.D.N.Y. Oct. 30, 2020);

McCloud v. Prack, 55 F. Supp. 3d 478, 481-82 (W.D.N.Y. 2014) ("Plaintiff's allegations that

Olles deliberately conducted an inadequate investigation for the purpose of covering up Griffin's

alleged misconduct, and that he did so at the direction of defendant Shepanski, are likewise

insufficient to make out a § 1983 claim against either of them.").

## IV. Corrections Officer Becker[14]

Plaintiff avers that at 2:05 PM on June 17, 2018, after being out in the yard, he alerted

C.O. Becker that he (plaintiff) urgently needed medical care.  Becker advised him at 2:35 PM

that he (Becker) had contacted the medical unit for assistance and that medical care was "on the

way," but medical never came until Becker went off shift and his replacement observed, at 3:00

PM, that plaintiff was in distress.  Plaintiff concludes from this that Becker lied about calling

medical and did not inform other staff of plaintiff's distress, and that this demonstrates that

Becker was deliberately indifferent to his "medical emergency."

The medical records show that two health care providers from the medical unit saw

plaintiff on June 17, 2018, prior to 3:32 PM, and completed their evaluation by 3:46 PM.  The

treatment notes state that plaintiff reported 1 ½ hours of chest pain, profuse sweating, dizziness,

seeing spots, and "not feeling right."  The notes further indicate that plaintiff had "recovered" by

the time he was seen.  The notes go on to state that plaintiff had a history of an abnormal EKG,

---

[14] Plaintiff's various pleadings asserted three separate claims against C.O. Becker, but in opposing defendants' motion for summary judgment, he has only addressed one.  Because he is *pro se*, I have reviewed the other two and conclude that the record shows that he is not entitled to relief.

and that he should be sent for further cardiac evaluation.  No other treatment was provided.

Plaintiff has not disputed any of the entries in these medical records.

Under the standards set forth above with respect to Dr. Geraci and Dr. Ari, plaintiff has

failed to raise an issue of fact as to deliberate indifference in providing medical treatment.  Even

assuming that C.O. Becker lied to him about contacting the medical department (and there is

nothing to support that except plaintiff's characterization), plaintiff has not adduced evidence

that he had a "sufficiently serious need" of immediate medical treatment.  Darnell, 849 F.3d at

29.  In considering whether a delay caused a risk of harm, a court may consider "[t]he absence of

adverse medical effects or demonstrable physical injury."  Smith v. Carpenter, 316 F.3d 178, 187

(2d Cir. 2003).  To meet the objective prong for a claim of deliberate indifference to serious

medical needs, a plaintiff must show that he actually did not receive adequate care and that the

inadequacy in medical care was sufficiently serious.  Salahuddin v. Goord, 467 F.3d 263, 280

(2d Cir. 2006).

Nothing in plaintiff's description of his symptoms shows that he was at risk of death or

degeneration.  And although plaintiff seizes on terms used in the caselaw by characterizing his

discomfort as "extreme" or "excruciating," the undisputed facts are that he recovered on his own

within 1 ½ hours of first reporting his symptoms to Becker.  These facts in their totality show

that the 1 ½ hour delay did not constitute deliberate indifference to a serious medical need.  See

Bumpus v. Canfield, 495 F. Supp. 2d 316, 322 (W.D.N.Y. 2007) (dismissing deliberate

indifference claim based on "a delay of several days in dispensing plaintiff's hypertension

medication" absent evidence that "the delay gave rise to a significant risk of serious harm"); see

also Lewis v. Cavanugh, 685 F. App'x 12, 14 (2d Cir. 2017) (affirming dismissal of deliberate

indifference claim where prisoner complained that his "head was swollen"; that he was "seeing

double"; and that he was "dizzy, nauseous," and later was treated only for bruising and minor abrasions).

## V.      State Law Claims

Defendants seek summary judgment dismissing plaintiff's state law claims that fall under this Court's supplemental jurisdiction.  Their argument is that plaintiff failed to timely file a notice of claim for any of these claims, and that such a notice is a prerequisite for maintaining them.  N.Y. Gen. Mun. Law § 50-e *et seq.*  Plaintiff does not dispute this, and his opposition may reflect that he does not understand the distinction between his federal and state claims.  Again, however, because of his *pro se* status, I have considered whether to dismiss the state law claims or decline to exercise my supplemental jurisdiction over them under 28 U.S.C. § 1367.

My conclusion is that the state law claims should be dismissed for failure to file the required notice of claim.  This case is over three years old and even a glance at the docket sheet shows that it has been extensively litigated at great cost and burden to all parties.  Permitting plaintiff to start anew in state court would not be in the interests of justice or efficiency, as the need to have filed a notice of claim is firmly established and regularly followed under state law. See Radin v. Tun, 12-cv-1393, 2015 WL 4645255, at *15-16 (E.D.N.Y. Aug. 4, 2015) (exercising supplemental jurisdiction and dismissing state law claims after dismissal of federal claims where plaintiff had failed to file a notice of claim) (citing Cornado v. City of New York, No. 11 Civ. 5188, 2014 WL 4746137, at *4 (S.D.N.Y. Sept. 24, 2014) (on a motion to dismiss, dismissing the *pro se* plaintiff's supplemental state law claims along with his § 1983 claims where he failed to file a notice of claim)); Boda v. Phelan, No. 11-CV-28, 2014 WL 3756300, at *7 (E.D.N.Y. July 30, 2014) (same, on a motion for summary judgment); Excell v. City of New York, No. 12-cv-2874, 2012 WL 2675013, at *4 (E.D.N.Y. July 5, 2012).

20

**CONCLUSION**

Defendants' motion for partial summary judgment is granted.  The case will proceed to trial against the remaining defendant (see fn. 13 supra).

**SO ORDERED.**

Digitally signed by Brian M. Cogan

U.S.D.J.

Dated:  Brooklyn, New York
        February 10, 2021

21